**In re William Clarence UTNE, Debtor.**

**Bankruptcy No. 91–10189.**

United States Bankruptcy Court,
D. South Dakota, N.D.

Oct. 5, 1992.

Terry J. Sutton, Watertown, S.D., for debtors.

Thomas Lloyd, Asst. U.S. Atty., Pierre, S.D., for FmHA.

## MEMORANDUM OF DECISION RE: MOTION TO DISMISS FOR BAD FAITH FILING

IRVIN N. HOYT, Chief Judge.

The matter before the Court is the Motion to Dismiss filed by the United States Attorney on behalf of the Farmers Home Administration and the objection thereto filed by Debtors. This is a core proceeding under 28 U.S.C. § 157(b)(2). This ruling shall constitute Findings and Conclusions as required by F.R.Bankr.P. 7052.

### I.

William C. Utne and Thomas J. Utne began farming as a partnership in 1970 or 1971. William C. owned the real property, which was located south of Ortley, South Dakota. The brothers owned the farm machinery jointly. During their partnership, they had dairy and stock cows plus they did some grain farming. On January 10, 1985, Chapter 11 petitions for the Utne Brothers (the partnership), Bankr. No. 185–00012; William C. and Glenda K. Utne, Bankr. No. 185–00011; and Thomas J. and Rondi A. Utne, Bankr. No. 185–00010, were filed. The cases were substantively consolidated by order entered February 20, 1985.[1] On July 15, 1986, a plan of reorganization for the three consolidated cases was confirmed. The confirmed plan provided the following treatment:

*Class 1—Farmers Home Administration.* Farmers Home Administration has an allowed secured claim in the sum of

$301,780.00. Of this sum, $228,400.00 represents the balance due under the original terms of two Contracts for Deeds, which Contracts were purchased by Farmers Home Administration from the seller, and Agnes Utne. The balance due under these Contracts in the sum of $228,400.00 will bear interest at the rate of 6 percent per annum from the effective date of the Plan to January 1, 1987, at which time interest will be brought current and the remaining sum of $228,-400.00 will be amortized over a period of 15 years with interest at 6 percent per annum, which complies with the original terms of the said Contracts for Deed. A first amortized payment of $23,516.70 will then be paid on January 1, 1988, with payments to follow in like amounts on January 1st of each year thereafter under January 1, 2002, at which time these Contracts will be paid and satisfied in full and Farmers Home Administration will then give a Warranty Deed to the Debtors on the 880 acres of Agnes Utne's land. In addition, Farmers Home Administration has an allowed secured claim on chattels in the sum of $73,-380.00 which represents the equity available to FmHA on Debtors' chattels. This sum of $73,380.00 will bear interest at the rate of 7.25 percent per annum from and after the effective date of the Plan and interest will be brought current on January 1, 1987, at which time the remaining balance of $73,380.00 will be amortized over a period of 20 years with interest at 7.25 percent per annum with a balloon payment after 15 years. Accordingly, a payment of $7,061.71 will be paid on January 1, 1988, with payments in like amount on the first day of January of each and every year thereafter until January 1, 2002, at which time a balloon payment will be due on the remainder of the allowed secured claim on chattels in the sum of $35,823.38 and upon payment of such amount, the chattel debt will be paid and satisfied in full and Farmers Home Administration will release all liens, mortgages, encumbrances, and fi-

1. The Hon. Peder K. Ecker presiding.

nancing statements, whatsoever, against the Debtors' property.

*Section 1111(b)(2) Election.* Farmers Home Administration has filed a § 1111(b)(2) election regarding its status in the Plan of Reorganization, and by virtue of that election, Farmers Home Administration will be vested with all of the benefits and detriments attached by law to such an election. In that the claim of Farmers Home Administration was allowed to the extent of $477,084.66, Farmers Home Administration will have a lien on property of the Debtors secured to that extent until such time as the case is dismissed, or the payments under the Plan have been completed as provided herein. In that Farmers Home Administration is secured to the full extent of its allowed claim by virtue of § 1111(b)(2) election, there is no undersecured property or payments provided therefor.[2]

The confirmed plan also stated that previously allowed administrative expenses, including fees for the debtors' counsel, William J. Pfeiffer, would be paid on the effective date of the plan if not paid sooner. Additional administrative expenses were to be paid when allowed by the Court.[3] Payment of past due or future real estate taxes was not addressed in the Chapter 11 plan although the debtors' real estate taxes in Roberts County have not been paid since 1982.

On February 5, 1987, the Chapter 11 debtors and FmHA filed a Stipulation for an Order of Modification of Plan After Confirmation. The stipulation acknowledged that the parties had failed to recognize equity of $67,420.00 in certain property on which FmHA had a second mortgage. The parties proposed to resolve this error by adding the following paragraph to the confirmed plan:

In addition, Farmers Home Administration has an allowed secured claim on real estate consisting of a second mortgage on the E½ of Section 30–122–52, Roberts County, South Dakota, in the sum of $67,420.00, which amount will be amortized on January 1, 1987, at the rate of 5% interest per annum over a period of 19 years, thereby providing a first payment of $5,579.00 on January 1, 1988, with additional payments in like amount to be made to FmHA on the first day of January of each and every year thereafter until the final payment on January 1, 2007, at which time all indebtedness secured by real estate will be paid and satisfied in full, and Farmers Home Administration shall thereupon release all liens, mortgages, encumbrances, and financing statements, whatsoever, against the Debtors' real and personal property.

An Order approving the stipulated modification was entered February 11, 1987. Litigation between the Chapter 11 debtors and some creditors continued through July 18, 1988. A Final Decree was entered December 28, 1988.[4]

William C. Utne and Glenda K. Utne were divorced in the spring of 1987. In the property settlement, William C. Utne received all real property and assumed all the couple's debts associated with the farm. He expended about $10,000.00 in legal fees for the divorce and subsequent child custody litigation.

In addition to the divorce, William C. Utne experienced several other major changes in his personal life and business. His father died in the summer of 1987. His farming partner and brother, Thomas J. Utne, left the farm to live in Harrisburg, South Dakota and work at John Morrell & Company in Sioux Falls, South Dakota in

**2.** The Chapter 11 debtors and FmHA had a cash collateral agreement during the Chapter 11. This agreement was poorly memorialized in the Chapter 11 file. Consequently, the Court is unable to determine whether the Chapter 11 debtors repaid that cash collateral through the plan or otherwise.

**3.** As of confirmation, Attorney Pfeiffer had been awarded $11,701.13 in fees against which was

applied a retainer of $6,000.00. By Order entered January 24, 1990 (post-confirmation), Attorney Pfeiffer was awarded $7,075.63. This included $3,823.25 for new services rendered plus $3,252.38 in unpaid fees from an Order approving fees entered November 5, 1985.

**4.** The Hon. Irvin N. Hoyt presiding.

the fall of 1987. In late 1988 and early 1989, Thomas J. Utne's wife, Rondi A. Utne, had felony criminal charges brought against her for no account and insufficient fund checks totaling over $40,000.00. William C. Utne spent about $11,000.00 in legal fees for her defense and to make partial restitution. Finally, in late April, 1989, William C. Utne's mother died in a traffic accident near the family home.

During these several years after the confirmation of the Chapter 11 plan, William C. Utne continued to operate the dairy and stock cow farm with the assistance of a hired man and weekend and vacation-time help from his brother Thomas. Approximately 702 acres of Utne family farm land, of which William C. Utne owned 630 acres and farmed the remainder for his mother's estate, was put into the Conservation Reserve Program sometime in 1987. Consequently, Thomas J. Utne's help was no longer necessary for the operation of the farm. William C. Utne also had seasonal off-farm employment as a heavy equipment operator.

Thomas J. Utne and Rondi A. Utne filed a Chapter 7 petition on February 19, 1990. The case was converted to a Chapter 13 proceeding on August 1, 1990.[5] Their plan of reorganization was confirmed November 13, 1990.[6] That plan provided for these debtors to abandon their interest in unspecified secured property to several creditors, including Roberts County and Grant County. Unsecured claims totaled over $199,950.00.[7] The plan provided that these unsecured creditors would receive the debt-

ors' net disposable income over the life of the plan. However, none was projected. The only creditor certain to receive payments under this Chapter 13 plan was the Internal Revenue Service. Chapter 13 Trustee Rick A. Yarnall has filed a motion to dismiss this case because the debtors are in arrears on payments. The hearing is scheduled for October 29, 1992.

Contemporaneous with Thomas and Rondi Utne's Chapter 13 case, Thomas J. Utne and William C. Utne informally dissolved their partnership. They sold their stock cows and paid the Chapter 11 secured claim of Production Credit Association (PCA). Thomas J. Utne, with William C. Utne, is still listed as a beneficiary on three Conservation Reserve Program contracts that pay approximately $30,000.00 per year ($15,000.00 to each brother). FmHA offset William C. Utne's 1991 CRP check on October 23, 1991 against its Chapter 11 claim.

By the fall of 1992, all the secured Chapter 11 creditors except FmHA were paid in full.[8] No payments were made on the Chapter 11 unsecured claims.

On October 29, 1991, William C. Utne filed a Chapter 12 petition. Among his scheduled creditors was FmHA, who was listed as a secured creditor holding a blanket mortgage on Debtor's real estate. Debtor valued FmHA's claim at $468,209.00 and the property at $329,000.00 leaving an unsecured claim of $139,209.00. Priority creditors include Roberts County for $31,000.00 in real estate taxes and the Internal Revenue Service for $2,000.00 for

---

5. These debtors were not eligible for a Chapter 7 discharge because they had received a Chapter 11 discharge on July 15, 1986. *See* 11 U.S.C. § 727(a)(8). No one filed an objection to their Chapter 13 plan on the grounds of lack of good faith.

6. Despite the fact that the consolidation order in the Utnes' Chapter 11 cases stated that the "assets of the [three Chapter 11 debtors] shall be treated as common assets and the claim of creditors deemed claims against the common fund," the Chapter 13 plan did not recognize that Thomas J. and Rondi A. Utne may have had an obligation to FmHA based on that consolidation order and confirmed Chapter 11 plan. No party in interest, however, objected to the Chapter 13

plan on that ground. A similar argument has likewise not been made in this case.

7. Of Thomas J. and Rondi A. Utne's Chapter 13 unsecured debts, a total of $118,259.80 of them were initially listed in the debtors' Chapter 11 schedules.

8. The Chapter 11 secured creditors that were paid in full prior the Chapter 12 petition, included, according to Debtor's testimony: Federal Land Bank, $15,554.51; Production Credit Association, $92,000.00; Eugene Determan, $2,170.00; J.I. Case, $8,811.79; John Deere Co., $4,000.00; Norwest Bank of Milbank, amount not stated; Norwest Bank of Watertown, $10,367.00; Grant County Implement, $4,000.00; and Batie, Inc., $1,540.20.

941 payroll taxes in 1989. Debtor did not list any unsecured claim holders.

On December 23, 1991, Farmers Home Administration filed a Motion to Dismiss Case because Debtor had failed to timely file his schedules and statements. That motion was withdrawn on January 30, 1992.

Debtor filed an amended schedule of unsecured claim holders on January 30, 1992 to include a claim of $10,000.00 by Bill [William J.] Pfeiffer, Debtor's Chapter 11 counsel. Also on January 30, 1992, Debtor amended his schedule of personal property to include unspecified property valued at $8,500.00 and his schedule of property claimed exempt to include unspecified property valued at $671.00.

Debtor filed a Chapter 12 plan on January 29, 1992 and an Amended Chapter 12 Plan on January 30, 1992. The amended plan is a five year plan. In it Debtor proposes to pay IRS its priority claim of $4,263.02 over five years without interest. Debtor proposes to pay Roberts County's priority claim of $43,271.22 over five years with ten percent interest and to pay Grant County its priority claim of $9,943.53 over five years with ten percent interest. Debtor proposes the following treatment of FmHA's claim:

Farmers Home Administration has an undersecured claim upon the mortgage of Debtor's real estate located in [Clark, Grant, and Roberts counties].... in the amount of Four Hundred Seventy Thousand Nine Hundred Twenty Three Dollars and Ninety Seven Cents ($470,-923.97), the secured portion of which is in the amount of Four Hundred Seventeen Thousand Seven Hundred Nine Dollars and Twenty Two Cents ($417,709.22) which shall be paid according to the following schedule:

| LOAN CODE | PRINCIPAL & INTEREST | YEARS | INTEREST RATE | ANNUAL PAYMENT |
|---|---|---|---|---|
| 41–19 | $383,000.00 | 25 | 7.25 | $33,608.98 |
| 44–20 | | | | |
| 44–21 | 87,923.97 | | | |

Annual payments in the amount of Thirty Three Thousand Six Hundred Eight Dollars and Ninety Eight Cents ($33,608.98) shall commence one (1) year after the effective date of the plan.

The Debtor further agrees to continue to cooperate and comply with all applicable FmHA regulations, administration loan servicing requirements, and the terms of all notes security agreements, loan documents and agreements. Farmers Home Administration shall continue to service these loans normally according to these provisions. Should the normal loan servicing conflict with the Debtor's Chapter 12 Plan, the Plan shall supersede in respect to the treatment of the claim of Farmers Home Administration.

The unsecured portion of this claim in the amount of Eighty Seven Thousand Nine Hundred Twenty Three Dollars and Ninety Seven Cents ($87,923.97) shall be treated in Class V, below. All commissions, fees charges and other assessments due to the trustee shall be borne solely by the Debtor and the above payment shall be interpreted as "net" of these trustee's commissions.

E. CREDITORS HAVING UNSECURED CLAIMS WITHOUT PRIORITY:

CLASS V. UNSECURED CREDITORS

Included also in this unsecured portion of the undersecured claims of the Farmers Home Administration. These claims shall be paid a dividend of Three Thousand Dollars ($3,000.00) per year to be divided pro rata amongst the unsecured creditors. The Debtor further dedicates his "net" disposable income as determined by the Chapter 12 Trustee for distribution to unsecured creditors. All

commissions, fees, charges and other assessments due to the Trustee shall be borne solely by the Debtor and the above payments shall be interpreted as "net" of these trustee's commissions. Their claims and dividends are as follows: ·

| CREDITORS | CLAIMS |
|---|---|
| Farmers Home Administration | $87,923.97 |
| William J. Pfeiffer | 10,325.50 |

The plan filed on January 29, 1992 had a liquidation analysis and an expense and income projection attached to it. The amended plan filed on January 30, 1992 did not have these attachments.

Debtor purchased 27 bred stock cows in mid-February, 1992.[9] He sold his remaining 35 head of dairy cows the first part of March, 1992 and quit the dairy portion of his farming.[10] Debtor's liquidation analysis and expense and income projections attached to his Chapter 12 plan did not reflect these major changes in his farm operation.

On February 18, 1992, FmHA filed an objection to Debtor's plan on several grounds, including lack of good faith in the plan's proposal. Day County filed an objection to the plan on March 9, 1992. It argued the plan failed to provide for payment of priority real estate taxes for 1989 and 1990 totaling $926.29 plus interest and penalty. A hearing on these objections was held March 17, 1992. It was continued until April 21, 1992 to allow Debtor time to resolve additional objections.

On April 30, 1992, FmHA filed a motion to dismiss Debtor's case on the grounds that Debtor's plan is not filed in good faith. FmHA argued that Debtor's Chapter 12 case is a de facto modification contrary to 11 U.S.C. § 1127; the current Chapter 12 case is a de facto conversion of the prior Chapter 11 contrary to §§ 302(c)(1), Title 11 of the Family Farmer Bankruptcy Act; Debtor made no attempt to comply with FmHA's and the "County Treasurer's" treatment under his previous Chapter 11

plan; the petition was filed to invoke the automatic stay; Debtor's original schedules contain several misstatements; and the Chapter 12 plan "substantially prejudices FmHA's treatment under the previous Chapter 11 plan, including FmHA's 1111(b)(2) election." Debtor did not file a response to FmHA's motion to dismiss.

The April 21, 1992 confirmation hearing was continued until May 20, 1992 so that it could be heard in conjunction with a hearing on FmHA's motion to dismiss.

The hearing on confirmation and FmHA's motion to dismiss was held May 19, 1992.[11] The Court bifurcated the issues into whether Debtor had proposed his plan in good faith and feasibility. Only the good faith issue was addressed that day. The only witness to testify was Debtor. Several exhibits detailing Debtor's involvement in the prior Chapter 11 consolidated case, the status of his brother's Chapter 13 case, and the circumstances of Debtor's business and personal life since the Chapter 11 confirmation discussed above (deaths in his family, high legal fees for divorce and child custody litigation, and payment of legal fees and restitution for his sister-in-law's criminal doings) were presented. Debtor further testified that he owned some feed worth $1,400.00, a bull purchased for $1,500.00, and an interest in a family lake cabin in Day county valued at $18,000.00. None of these assets were scheduled. Debtor also acknowledged he maintained a trust account with a date-of-petition balance of about $23,000.00 with Attorney Terry C. Sutton that was not scheduled. He also testified that he leased farm land to two persons but that his schedules failed to disclose these executory contracts.

The motion to dismiss was taken under advisement after both parties filed post-hearing memorandums and FmHA submitted affidavits of Lee Schoenbeck, Debtor's divorce and child custody attorney, and

---

9. These cows had 25 calves later in 1992.

10. Approval of these transactions was not obtained from the Court under 11 U.S.C. § 363(b)(1).

11. At the beginning of the hearing, Debtor's counsel announced that he had reached a settlement for the treatment of Attorney Pfeiffer's claim for unpaid legal fees from the prior Chapter 11 case.

Curtis Sylte, the Roberts County Executive Director of ASCS.

## II.

■ There is no per se rule against successive filings except as provided under the Bankruptcy Code. *Schuldies v. United States (In re Schuldies)*, 122 B.R. 100, 101 (D.S.D.1990). Instead, a petition to reorganize and the proposed plan of reorganization each must be filed in good faith. *Id.* at 102. "The bankruptcy court must be concerned whether or not there was a strategy behind the subsequent filings to frustrate statutory requirements and abuse the bankruptcy process." *Id.* (citing *In re Chisum*, 847 F.2d 597, 600 (9th Cir.1988)). *See also In re Henke*, 127 B.R. 255 (Bankr. D.Mont.1991); *In re Miller*, 122 B.R. 360 (Bankr.N.D.Iowa 1990).

■ Good faith is a factual determination. *Schuldies*, 122 B.R. at 102. Factors to consider include whether a final decree was entered in the previous case, the length of time between the discharge of the Chapter 11 and the filing of the Chapter 12 petition, whether the filing was made to obtain the benefits of the automatic stay; the debtor's effort to comply with the previously confirmed and consummated Chapter 11 plan; recognition that Congress intended a debtor to achieve the goals of bankruptcy through the filing of a single case; and other relevant facts. "The court should examine the 'totality' of the circumstances surrounding the filing." *Id.* at 103 (citing *In re Russo*, 94 B.R. 127, 129 (N.D.Ill.1988)). *See also Euerle Farms, Inc. v. State Bank in Eden Valley (In re Euerle Farms, Inc.)*, 861 F.2d 1089, 1091–92 (8th Cir.1988) ("[A] multiplicity of factors may be considered in the aggregate to meet the cause requirement of [§ 1208(c) ]"; the filing of a bankruptcy petition without the intent or ability to properly reorganize renders a petition subject to dismissal).

This Court, following *First National Bank v. Kerr (In re Kerr)*, 908 F.2d 400, 404 (8th Cir.1990), has previously found that bad faith warranting dismissal of a reorganization case may include concealment, evasion, and direct violations of the Code or a court order that clearly establish an improper motive. *In re Coones Ranch, Inc.*, 138 B.R. 251, 258 (Bankr.D.S.D.1991). Violations of the Code or an Order encompass self-dealing and asset manipulation without court approval. *Id.*

Some successive filings of bankruptcy petitions are specifically prohibited by law.[12] Most noteworthy here is § 302(c)(1) of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986. That section states:

> The amendments made by [the Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986, Pub.L. 99–554, 100 Stat. 3088] shall not apply with respect to cases commenced under Title 11 of the United States Code before [November 26, 1986].

This statute states a Chapter 11 case pending at the time Chapter 12 was created may not be converted to a Chapter 12 case. *United States v. Erickson Partnership (In re Erickson Partnership)*, 856 F.2d 1068 (8th Cir.1988). Further, a dismissal of a Chapter 11 case with a confirmed and substantially consummated plan and the subsequent filing of a Chapter 12 case may constitute an impermissible "de facto" conversion under § 302(c)(1). *Howe v. Vaughn (In re Howe)*, 913 F.2d 1138, 1148–49 (5th Cir.1990).

In addition to § 302(c)(1), 11 U.S.C. § 1112(d) also governs conversion of Chapter 11 cases to Chapter 12. It provides:

> The court may convert a case under this chapter to a case under chapter 12 or 13 of this title only if—
>
> (1) the debtor requests such conversion;
>
> (2) the debtor has not been discharged under section 1141(d) of this title; and
>
> (3) if the debtor requests conversion to a chapter 12 of this title, such conversion is equitable.

12. *See, e.g.,* 11 U.S.C. § 109(g).

### III.

■ Upon consideration of the statutes and case law discussed above, this Court concludes that Debtor's Chapter 12 petition and plan were not filed in good faith.

■ First, while Debtor was able to show that some unanticipated legal expenses for himself and his family arose after the Chapter 11, those sums expended, though large, did not adequately account for his complete failure to make payments on FmHA's Chapter 11 claim, the Chapter 11 unsecured claims, and his Roberts County real estate taxes. While bona fide changes in circumstance may justify a successive chance to reorganize, *Schuldies*, 122 B.R. at 101, the family problems and changes to which Debtor testified inadequately explained why he should be permitted to reorganize FmHA's debt a second time. The only money FmHA received was an offset against a CRP payment made just a few days before Debtor filed his Chapter 12 petition. Most notable, Debtor provided no explanation of why other Chapter 11 secured creditors were paid in full while FmHA, Roberts County, and unsecured creditors received nothing.[13] Absent some justification of why Debtor failed to make these payments in the Chapter 11, an attempt to now address them in a new Chapter 12 is indicia of bad faith. *Henke*, 127 B.R. at 256–57; *Miller*, 122 B.R. at 367.

Second, Debtor's Chapter 12 plan is essentially an impermissible de facto conversion of his prior Chapter 11 case, contrary to the intent of both § 302(c)(1) of the 1986 Bankruptcy Act and § 1112(d) of the Code.[14] Further, it is an impermissible de facto modification of a Chapter 11 plan after confirmation and substantial consummation, contrary to 11 U.S.C. § 1127(b). Debtor is taking the exact debt to FmHA addressed in the Chapter 11 case and now trying to reorganize it again under the broader provisions of Chapter 12. This second reorganization attempt by Debtor circumvents FmHA's 1111(b) election in the Chapter 11, avoids the absolute priority rule that protected his unsecured Chapter 11 creditors, and violates the intent of §§ 302(c)(1), 1112(d), and 1127(b). *Henke*, 127 B.R. at 256–57; *Miller*, 122 B.R. at 366–67.

Third, after filing his Chapter 12 plan, Debtor failed to abide by certain Code requirements.[15] He sold and bought estate cattle out of the ordinary course of his business without Court approval. Such asset manipulation cannot be condoned. Debtor's schedules were incomplete. He failed to list some real property, a bull, some feed on hand, a large trust account he maintained with his attorney, and some executory contracts. Further, the amended schedules he did file on January 30, 1992 are impossible to understand since the property added was not separately itemized and valued. Finally, the income and expense attachments to his plan were inaccurate because they failed to reflect the major change in his operation away from milk production. This error put himself, his creditors, and the Court ten steps behind at the confirmation/dismissal hearing. It was an error that could and should have been corrected earlier because Debtor had between January 30, 1992 (the date his amended petition was filed) and May 19, 1992 (the day of the confirmation/dismissal hearing) to recognize and correct it.

The Court notes that it found Debtor to be honest. The dismissal of his Chapter 12 case should not be read as a condemnation of his decision to give financial help to his family. Under the directives of *Kerr*, *Schuldies*, and *Coones*, however, Debtor's Chapter 12 case must be dismissed because

---

**13.** The Court acknowledges that Debtor did not reduce the secured value of FmHA's claim by the amount of unpaid taxes.

**14.** There is a de facto breach of § 302(c)(1) because Debtor is trying to reorganize a debt first addressed in a Chapter 11 case filed before November 26, 1986. There is a de facto breach of § 1112(d) because Debtor received a dis-charge under § 1141(d) and his second attempt to reorganize FmHA's claim is not equitable.

**15.** The Court has insufficient evidence to determine whether Debtor failed to disclose assets and proposed transactions to his counsel or whether counsel failed to follow-through once he received the information.

his successive petition and proposed plan of reorganization were not filed in good faith.

An order will be entered dismissing the case. That order will render moot the confirmation of Debtor's proposed Chapter 12 plan.